DECISION
The Town of North Providence (Town or Plaintiff) seeks summary judgment on its complaint requesting a declaratory judgment against Sergeant David A. Drezek, in his capacity as President of the North Providence Police Lodge #13, Fraternal Order of Police (FOP or Defendant). The FOP has objected to the Town's motion and in turn requests this Court grant its cross-motion for summary judgment. *Page 2 
 I Facts and Travel
The Town and the FOP are parties to a collective bargaining agreement (CBA).[1] The Town is a municipal corporation and the FOP is a union certified by the Rhode Island State Labor Relations Board. Both parties seek this Court's guidance in resolving their dispute between the interplay of Article III, Section 1 of the CBA and Section 8-2-1 of the Charter of the Town of North Providence (Charter). Specifically, the Town does not believe that the CBA provision stating, "changes resulting in reduction in ranks and/or department strength are prohibited" is enforceable because of the Charter provision providing, "[t]here shall be such other officers of subordinate rank and patrolman as the council shall establish upon recommendation of the director of public safety. The council may provide for such organization *Page 3 
of the police department as it may deem necessary and appropriate for its efficient operation." (Def. Ex. 1, CBA, Article III, Section 1.); (Pl. Ex 3, Charter Art. 8-2-1 at 27.)
In 2009, the Town discontinued the practice of filling employment vacancies as they occurred. (Def. Memo. at 1, March 3, 2010.) In response to the practice, the FOP filed grievances which the Town denied. Prior to proceeding to arbitration, both the Town and the FOP agreed to ask this Court to decide the issue of whether the Charter prevents bargaining or arbitration on the dispute over the CBA provision.
The Town believes that the Charter gives the Town the authority to determine the size of the police department and that it is a non-delegable, non-bargainable duty of the Town to determine the department size. Further, the Town believes its Charter mandates it to unilaterally organize the superior officer complement of the police department without the issue being susceptible to bargaining or arbitration. The Town argues alternatively that if the Charter does not provide it with such authority, it has the authority pursuant to its inherent rights of management.
Conversely, the FOP believes that the Charter and the CBA provision are consistent because it interprets the Charter as an enabling act. Thereafter, the FOP argues the Town is free to negotiate with the FOP just as any other city or town would pursuant to the Municipal Police Arbitration Act (MPAA).See § 28-9.2-1 et seq. Indeed, it argues that the MPAA supercedes any duties the Town may have pursuant to its Charter because the MPAA applies alike to all cities and towns.O'Neill v. City of Providence,480 A.2d 1375, 1379 (R.I. 1984). The FOP further insists that even if setting the size of the workforce is not subject to mandatory bargaining, the Town was free to bargain over the issue. Accordingly, the FOP asserts that it has a valid contract with the Town and that if the agreement is not enforced, it would violate the "Contracts Clause" *Page 4 
of the United States or Rhode Island Constitution. U.S. Const. Art. I, § 10 (providing "no State shall . . . pass any . . . Law impairing the Obligation of Contracts); R.I. Const. Art. I, § 12 (stating No . . . law impairing the obligation of contracts, shall be passed).
Article 8-2-1 of the Charter is entitled "Organization and Function." It provides, in pertinent part:
 "The chief of police shall be the commanding officer of the police department. There shall be such other officers of subordinate rank and patrolman as the council shall establish upon recommendation of the director of public safety. The council may provide for such organization of the police department as it may deem necessary and appropriate for its efficient operation.
 * * * *
 It shall be the duty of the chief of police to have direct supervision over all personnel under his command and to proscribe rules and regulations, as approved by the director of public safety, for the efficient operation and discipline of his department." (Pl. Ex 3, Charter Art. 8-2-1 at 27.)
As for the CBA, Article III, Section 1 provides:
 "The Town shall supply the Union with the current Organizational Chart within thirty (30) days from the ratification of each agreement, upon which shall be listed the numbers and ranks of officers and patrolmen authorized to serve on the department. A copy of the Organization Chart shall be attached to and made a part of this agreement.
 Any changes in the Organizational Chart, including but not limited to, changes in its design, staffing, numbers and/or ranks shall be management's prerogative. However, changes resulting in reduction in ranks and/or department strength are prohibited." (Def. Ex. 1, CBA, Article III, Section 1.)
Further, Article VII of the CBA, Section 3, entitled "Permanent Vacancies," provides, "[a] permanent vacancy is created when any of the following personnel transactions occur: retirement, resignation, termination. . . . A permanent vacancy shall be filled within thirty (30) *Page 5 
days unless otherwise provided for in the agreement." Id.
And Section 5 of Article VII of the CBA, entitled "Filling Patrolmen Vacancies," provides, "[w]henever a permanent vacancy occurs within the department, the Public Safety Director shall, within thirty (30) days therefrom, fill said vacancy. . . ." Id.
 II Jurisdiction
It is well-settled that a declaratory judgment "is neither an action at law nor a suit in equity but a novel statutory proceeding. . . ." Northern Trust Co. v. Zoning Bd. of Review ofTown of Westerly, 899 A.2d 517, 520, n. 6 (R.I. 2006) (quotingNewport Amusement Co. v. Maher,92 R.I. 51, 53, 166 A.2d 216, 217 (1960)). This Court acknowledges that the purpose of the Uniform Declaratory Judgments Act ("UDJA") is "to allow the trial justice to `facilitate the termination of controversies.'" Bradford Assocs. v. R.I. Div. of Purchases,772 A.2d 485, 489 (R.I. 2001) (citations omitted). Thus, the UDJA grants broad jurisdiction to the Superior Court to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." G.L. § 9-30-1; see also Sullivan v.Chafee, 703 A.2d 748, 751 (R.I. 1997) (stating that trial court's "decision to grant or to deny declaratory relief under the [UDJA] is purely discretionary[]"). Our Supreme Court has approved of this court's jurisdiction to resolve disputes between state law and collective bargaining agreements pursuant to the UDJA. Vose v.R.I. Brotherhood of Correctional Officers,587 A.2d 913 (R.I. 1991).
"[T]he issue of whether a dispute is arbitrable concerns a question of law and is subject to a broader standard of review than is the arbitrator's decision on the merits. Courts should not equate the issue of arbitrability with the deference due the arbitrator's interpretation of the contract." State Dept. of Mental Health,Retardation, and Hospitals V. R.I. Council 94, *Page 6 A.F.S.C.M.E., AFL-CIO, 692 A.2d 318, 323 (R.I. 1997) (internal citations omitted). This is true "especially when the question is not merely of contractual interpretation (that is, whether and to what extent the parties did agree to arbitrate) but of statutory authority (that is, whether and to what extent the parties could agree to arbitrate away a power that is statutorily given to the department and its director)." Id.
 III The Charter and the MPAA Law
The General Assembly has the power to pass laws impacting cities and towns provided that the law does not affect the form of government of the city or town. See
R.I. Const. Art. XIII, § 4. If, conversely, a city or town charter portends to regulate the conduct on a matter of statewide concern, the General Assembly must expressly validate the act. Town ofJohnson v. Santilli, 892 A.2d 123, 128 (R.I. 2006) (citingRoyal v. Barry,91 R.I. 24, 30, 160 A.2d 572, 575 (1960) (recognizing charter provision could not regulate school committee unless expressly ratified by general assembly); Local No. 799, InternationalAssociation of Firefighters AFL-CIO v. Napolitano,516 A.2d 1347 (R.I. 1986) (determining that the clear and unambiguous intent of the Legislature was to enact P.L. 1981 Ch. 37 as an exception to the general law, and thus held that the charter provision was a special act taking "precedence over any inconsistent provisions of the general laws). It is beyond dispute that the regulation of police officers is a matter of statewide concern. McCarthy v. Johnson,574 A.2d 1229 (R.I. 1990); Bruckshaw v. Paolino,557 A.2d 1221, 1223 (R.I. 1989) (recognizing state maintains sovereignty over the regulation of *Page 7 
police affairs); Lynch v. King,120 R.I. 868, 876, 391 A.2d 117, 122 (1978) (alluding to long line of precedent giving general assembly control over police matters).
After the General Assembly expressly validates a charter provision, the Court is to treat the provision like a statute.Local No. 799, International Association of FirefightersAFL-CIO v. Napolitano, 516 A.2d 1347, 1349 (R.I. 1986). Moreover, if the approved charter provision clearly and unambiguously conflicts with an inconsistent provision of the General Laws, the Court should treat the charter provision as a special act which takes precedent over the General Laws. Id. (holding charter provision is special act and controls over inconsistent General Law). Alternatively, laws "which are not inconsistent with one another and which relate to the same subject matter are in parimateria and should be considered together so that they will harmonize with each other and be consistent with their general object and scope, even though they contain no reference to one another and were passed at different times." Providence TeachersUnion, Local 958, American Federation of Teachers, AFL-CIO v.School Committee of City of Providence,108 R.I. 444, 448, 276 A.2d 762, 765 (1971).
 Analysis
Currently, the General Assembly enacted the North Providence Home Rule Charter in its entirety, and therefore the Legislature intended to mandate every provision of the Charter. P.L. 1973, Ch. 237; see Munroe v. Townof East Greenwich, 733 A.2d 703, 709 (R.I. 1999) (noting that legislature's approval of charter did not imprint charter provision with legislative mandate because provision did not require ratification and charter was not ratified in its entirety) (citingCoventry School Cmte v. Richtarik,122 R.I. 707, 411 A.2d 912, 914-15 (1980). Article 8-2-1 of the Town Charter provides, "[t]here shall be such other officers of subordinate rank and patrolman as the council shall establish upon recommendation of the director of public safety. *Page 8 
The council may provide for such organization of the police department as it may deem necessary and appropriate for its efficient operation." (Pl. Ex 3, Charter Art. 8-2-1 at 27.) The General Assembly has also enacted the MPAA. The MPAA provides that police officers have the right "to bargain collectively with [the Town] . . . as to wages, rates of pay, hours, working conditions, and all other terms and conditions of employment." Sec. 28-9.2-4. The MPAA further provides "[a]ny collective bargaining agreement negotiated under the terms and provisions of this chapter shall specifically provide that the police officers who are subject to its terms shall have no right to engage in any work stoppage, slowdown, or strike, the consideration for the provision being the right to a resolution of disputed questions." Sec. 28-9.2-12.
This Court finds that the alleged special act of the Charter is not in direct conflict with the MPAA and accordingly must be read inpari materia. City of Cranston v. Rhode IslandLaborer's District Council, Local 1033,960 A.2d 529, 547 (R.I. 2008) (Flaherty, J., dissenting);see also Bertrand v. DiCarlo,304 A.2d 658, 660 (R.I. 1973) (acknowledging well-settled principle legislative grant's of municipal power strictly construed). It is entirely possible to construe the Charter provision in harmony with the MPAA. Berthiaume v. School Committee of City ofWoonsocket,121 R.I. 243, 248, 397 A.2d 889, 893 (1979) (observing courts should effectuate implied repeal of potentially conflicting laws only when laws "irreconcilably repugnant"). Doing so, the Charter allowed the council to establish the number of officers and patrolman, and subsequently, the council has the right to organize the police department in an efficient manner, subject to its duty to bargain collectively with the FOP over wages, hours, working conditions, and all other terms and conditions of employment. This reading is entirely consistent with the case law interpreting the interplay between home rule charters and the *Page 9 
General Laws, specifically the police or fire arbitration act.[2]City of Cranston v. Hall,116 R.I. 183, 354 A.2d 415 (1976) (holding that conflict between city charter and Fire Fighters Arbitration Act (FFAA) must be resolved in favor of FFAA because FFAA applies equally to all cities and towns and does not affect form of city government); Town ofNarragansettt v. Int'l Ass'n of Fire Fighters, AFL-CIO, Local1589, 119 R.I. 506, 380 A.2d 521 (1977) (holding minimum manpower requirements for specific stationhouse affects workload and therefore term and condition of employment and must be bargained over pursuant to Fire Fighters Arbitration Act);East Providence v. Local 850, Int'l Ass'n of Fire Fighters,AFL-CIO, 117 R.I. 329, 366 A.2d 1151 (1976) (citingHall to affirm that MPAA and FFAA superceded home rule charter); F.O.P. v. Providence,730 A.2d 17 (R.I. 1999) (recognizing MPAA and FFAA supercede ordinances enacted pursuant to the city charter).
 IV Conflict between Charter and CBA Law and Analysis
Construing the Charter in harmony with the MPAA, it is clear that the CBA provision does not frustrate the General Assembly's intent when it gave the Town the ability to establish and organize the police department. Our Supreme Court has noted,
 "[c]learly, there are circumstances in which a supervisor or director responsible for carrying out the state's responsibilities and `empowered by clearly delineated state law,' must be free to perform those duties unhampered by contrary provisions of a CBA. . . . It is a fundamental proposition that state law will trump contrary contract provisions when the statute provides for nondelegable or nonmodifiable duties and responsibilities in connection with the functions of state government. But there must *Page 10 
be a direct conflict between the statutory language and a competing contractual provision." State v. R.I. Council 94, A.F.S.C.M.E., AFL-CIO, Local 2409, 925 A.2d 939 (R.I. 2007) (internal citations omitted).
The current Charter provision referring to efficient organization is broad, discretionary, and modifiable. State v. R.I.Council 94, A.F.S.C.M.E., AFL-CIO, Local 2409,925 A.2d 939 (R.I. 2007) (stating state law supercedes contract provisions when state law non-modifiable). The cases the Town relies upon to argue the Charter should preclude arbitration are distinguishable. The Town relies initially upon LocalNo. 799, International Association of Firefighters AFL-CIO v.Napolitano. 516 A.2d 1347 (R.I. 1986). In Local No. 799, a union representing the Providence Fire Department sought a declaratory judgment enjoining enforcement of a provision of the home rule charter of the City of Providence, as validated by P.L. 1981, Ch. 37. The union argued that G.L. 1956 § 45-2-15 superceded the charter provision.
The charter provision provided that "[a]ll officers of the city . . . shall be residents of the city during such employment." The General Assembly subsequently ratified the charter provision in P.L. 1981, ch. 37. In direct contradiction, § 45-2-15 stated "[n]o city or town shall require that an individual reside within the city or town as a condition for . . . employment in its police or fire department." The Rhode Island Supreme Court determined that the clear and unambiguous intent of the Legislature was to enact P.L. 1981 Ch. 37 as an exception to the General Law and thus held that the charter provision was a special act taking "precedence over any inconsistent provisions of the general laws." LocalNo. 799, 516 A.2d at 1349.
Along the same lines, Plaintiff cites to Townof West Warwick v. Local 2045, to provide further support that the Charter should supercede the CBA and the MPAA. 714 A.2d 611 (R.I. 1998) (order), 714 A.2d 613 (amended order). In Local 2045, a validly enacted home rule charter provision barred a town from employing convicted felons. After two union workers were *Page 11 
terminated following felony convictions, the town sought a declaration that the union had no right to arbitrate the terminations. The Court, in a terse original order, held the charter "has the force and effect of state law" and that the terminations were not arbitrable because the felony provision was a mandatory condition precedent for employment with the town. Local2045, 714 A.2d at 612.
Subsequently, the Supreme Court issued an equally terse amended order, apparently to address the union's argument that the collective bargaining statute relating to municipal employees, § 28-9.4-1 et seq., superceded the town charter. The Court, however, was persuaded by the town's argument that when a general statute and a special statute conflict, the special statute controls. Local 2045, 714 A.2d at 614 (citing § 43-3-26).
Unlike Local 2045, the current Charter provision is not a condition precedent to employment that requires a mandatory act. In fact, it is essentially the complete opposite: a permissive abstract statement that the city council may set up the organization of the police department in an efficient manner, essentially giving the Town — if this Court were to read the Charter as it suggests — carte blanche to continually alter, amend, and adjust the department as it deems fit, regardless of what it had previously committed to in contract and without consideration of what the FOP may have given up to receive the illusory benefit.[3] Rather, this Court interprets the Charter provision as expressly providing the Town with the inherent rights of management that our Supreme Court has recognized public employers must have to formulate *Page 12 
and implement policies that go to the essence of the employers' mission as a public entity. See North ProvidenceSchool Committee v. North Providence Federation of Teachers, Local920, 945 A.2d at 346 (R.I. 2008) (observing school committees have plethora of powers and responsibilities that cannot be bargained away even in absence of specific statutory mandates);Barrington School Committee v. Rhode Island State Labor RelationsBoard, 120 R.I. 470, 479, 388 A.2d 1369, 1375 (1978) (recognizing school committee has certain rights that are "strictly within the province of management"); Narragansett v. Int'l Ass'n of FireFighters, AFL-CIO, Local 1589,119 R.I. 506, 380 A.2d 521 (1977) (suggesting bargaining topics not classifiable as terms and conditions of employment are left to discretion of management). Accordingly, this Court will proceed to analyze the scope of the bargaining relationship between the Town, a public employer, and the FOP, the union representing the police department employees.
 V Collective Bargaining with aPublic Employer — Inherent Rights of Management
The Town argues that setting the size and superior officer complement of its police workforce is an inherent right of management and that it cannot be bound by an agreement that contemplates such a hamstring. While the Town is correct that setting the size of its total workforce is an inherent right of management, it is not correct in asserting that the Union cannot seek arbitration when the Union alleges the Town reduced the size of the workforce during the term of the CBA and in direct contravention of the CBA.
It is well-settled that federal case law construing the phrase "terms and conditions" of employment has persuasive force in Rhode Island. Town of Narragansett v. Int'l Ass'n of Fire Fighters,AFL-CIO, Local 1589, 119 R.I. 506, 380 A.2d 521 (1977). Federal precedent establishes that certain managerial decisions go to the "core of entrepreneurial control," and thus *Page 13 
bargaining with the union over the decision cannot be mandated.Fibreboard Paper Products Corp. v. N.L.R.B.,379 U.S. 203, 223 (1964) (Stewart, J., concurring). The First Circuit, quoting largely from Fibreboard Paper Products, had the following to say about bargaining and core entrepreneurial decisions:
 "To be sure, certain management actions that ultimately may have a significant impact on the terms and conditions of employment within the bargaining unit are nonetheless beyond the purview of collective bargaining. . . . The thesis holds that important management decisions, such as choosing a marketing strategy or liquidating lines of business, are not concinnous subjects for mandatory collective bargaining because they are fundamental to the basic direction of the corporate enterprise. The components forming this core of entrepreneurial control are often classified as comprising matters that are akin to the decision whether to be in business at all. And while such matters are not primarily addressed to conditions of employment, they may have effects-sometimes profound effects-upon those conditions.
 * * * *
 Still, there is an important distinction between the right to bargain about a core entrepreneurial business decision (a right which a union does not possess) and the right to bargain about the effects of that decision on employees within a bargaining unit (a right which, depending upon the overall circumstances, a union may possess). After all . . . unions generally enjoy the right to bargain over the effects of decisions which are not themselves mandatory subjects of collective bargaining. It follows that, even when a particular managerial decision is not itself a mandatory subject of bargaining, the decision's forecasted impact on salaries, employment levels, or other terms and conditions of employment may constitute a mandatory subject of collective bargaining." Providence Hosp. v. N.L.R.B., 93 F.3d 1012, 1018 (1st Cir. 1996) (internal citations omitted) (internal quotations omitted).
Thus, an employer must bargain with the union only as to "wages, hours, and other terms and conditions of employment. The duty is limited to those subjects, and within that area neither party is legally obligated to yield. As to other matters, however, each party is free to bargain or not to bargain." Fibreboard,379 U.S. at 210 (quoting National Labor Relations Board v. *Page 14 Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349 (1958). Thus, in the private sector, although an employer has no obligation to bargain over decisions which go to the core of entrepreneurial control, it certainly has the right to do so.
In the public employer context, however, an employer's ability to "bargain or not to bargain," on issues above and beyond wages, hours, and other terms and conditions of employment is, as previously discussed, constrained. North ProvidenceSchool Committee v. North Providence Federation of Teachers, Local920, 945 A.2d 339, 346 (R.I. 2008) (stating school committees vested with plethora of powers and responsibilities even without statutory authorization); Belanger v. Matteson,115 R.I. 332, 357-63, 346 A.2d 124-41 (1976) (Paolino, J., dissenting) (highlighting differences between public and private sector collective bargaining). But see Jacinto v. Egan,120 R.I. 907, 391 A.2d 1173 (R.I. 1978) (observing that if "the public interest would be served by closer judicial scrutiny of the merits of an arbitration award made in the public sector, this service is to be afforded at the statehouse and not the courthouse").[4] Not only can a public employer not bargain away its statutory duties, but also, in the recently decidedNorth Providence School Committee v. North Providence Federationof Teachers, Local 920 decision, our Supreme Court recognized a union's inability to bargain or seek arbitration on issues which go to the essence of the public employer's mission. Local 920,945 A.2d at 346.
In Local 920, our Supreme Court analyzed the interaction between the collective bargaining process and Title 16 of the General Laws, which grants school committees broad *Page 15 
rights to manage and maintain educational systems.[5] The case involved a dispute between a town's school committee and the teachers' union. The school committee eliminated free composition periods for English teachers. The school committee did so for budgetary reasons. The high school had just lost two English teachers, and rather than hire two new teachers, as a means of reducing monetary expenditures, the school committee wanted to eliminate the composition period and then redistribute the existing English classes among the remaining English teachers. The union filed a grievance, and the school committee, along with several other arguments, believed it had the authority to eliminate the position pursuant to § 16-2-9(a), and that the dispute was not arbitrable because it had a statutory mandate to unilaterally make the decision.
The arbitrator determined that the rescinding of the composition period was based on monetary concerns and was thus not an educational policy decision but rather a work load decision based on money and, therefore, subject to negotiation. Our Supreme Court agreed. It stated:
 "It is because the school committee in this case opted to ground the abolition of the composition period primarily on a fiscal rationale that we have come to conclude that the arbitral decision need not be vacated. If the school committee had justified the elimination of the composition period on the primary basis that said elimination was undertaken for the purpose of improving the education of North Providence High School students in English and if the school committee had explained its thinking in that regard in a cogent manner, it is entirely possible that we would have considered that administrative decision to be non-arbitrable." Local 920, 945 A.2d at 347. *Page 16 
Our Supreme Court in Local 920 began its analysis of the issue with the well-recognized tenet that a public employer cannot bargain away a statutory duty. Two previous Rhode Island Supreme Court decisions — both cited by the Local 920
Court — are particularly helpful in properly understanding how our Court implements this policy, the first one being Vose v. R.I.Brotherhood of Correctional Officers, 587 A.2d 913 (R.I. 1991). In Vose, our Supreme Court addressed the issue of whether the Director of the Department of Corrections (DOC) had the authority to bargain away the statutory powers granted to him by G.L. 1956 § 42-56-10. The collective bargaining agreement between the union and the DOC provided that the Director could mandate involuntary overtime only in emergency situations. The Director, however — faced with a spiraling increase in inmates — mandated an involuntary overtime policy. The Director mandated the policy pursuant to § 42-56-10, which stated the director of the DOC shall "make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties including . . . safety, discipline, . . . employment, care, and custody for all persons committed to correctional facilities." Id. at 914.
The Court determined — comparing the case to Power v. City ofProvidence, 582 A.2d 895 (R.I. 1990) — that the bargaining agreement was in direct conflict with the statutory enactment and that the statutory powers of the Director could not be contractually abdicated. The Court noted that the contract provision could lead to a result that left the Director unable to provide for adequate security of the facility; a result the Court declared unfathomable.Vose, 587 A.2d at 916.
In a similar context, our Supreme Court decided State Dept. ofMental Health, Retardation, and Hospitals V. R.I.Council 94, A.F.S.C.M.E., AFL-CIO. 692 A.2d 318 (R.I. 1997). InState Dept. of Mental Health, a public employer argued that it had the right to limit its *Page 17 
employees' overtime hours to sixteen in a row because it believed that to allow them to work longer would jeopardize the health and safety of the patients. The union, however, argued that the CBA allowed employees to work longer than sixteen hours. Additionally, the union argued that G.L. 1956 §§ 36-11-1(a) and § 36-11-7, required negotiation and arbitration concerning disputes over hours of employment and working conditions.[6]
The Court acknowledged the union's argument but nonetheless stated,
 "the extent to which the state is obligated to arbitrate regarding its health-care employees' hours of work is not boundless. Rather it is circumscribed by the statutory obligations of the department and of the director to protect the disabled, custodial patients who are entrusted to their care. . . . Thus, neither the department nor its director is empowered to delegate to arbitrators the department's statutory obligation to take all steps necessary to provide for the health and welfare of these patients." Id. at 324.
The Court cited several times to the dissent in Belanger v.Matteson, 115 R.I. 332, 346 A.2d 124 (1976) for the proposition that a public employer may not be able to bargain away certain managerial rights. State Dept. of Mental Health,692 A.2d at 322.[7]
Thus, by the time our Supreme Court decided Local 920, it was well-settled that a public employer could not bargain away a statutory duty. The Local 920 Court, however, took this principle one step further, stating "[e]ven in the absence of such specific statutory mandates, however, school committees are vested with a plethora of powers and responsibilities that relate to the essence of the educational mission that may not be bargained away."Local 920, 945 A.2d at 346. *Page 18 
Later in the opinion the Court again emphasized the power the school committee had, asserting that it is "a basic rule of law that school committees are not at liberty to bargain away their powers and responsibilities with respect to the essence of the educational mission." Id. at 347. Recognizing the tension between this inherent power to make decisions that go to the essence of its mission, yet nonetheless bargain with the union over hours, wages, and terms and conditions of employment, our Supreme Court noted that it was "figuratively standing on the banks of the Rubicon."[8] Id. The Court ultimately held the issue was arbitrable, however, because the school committee's aim in eliminating the free periods was not to improve the education of the students, but rather to save money. Id.
In the present case, as in Local 920, it appears this Court is "on the banks of the Rubicon:" a very strong argument can be made that the decision setting the minimum size of the workforce in its police department goes to the essence of the Town's managerial prerogative to control the enterprise and cannot be bargained away.[9] Local 920, 945 A.2d at 347. Indeed, a public employer's decision setting the size of its workforce is an inherent right of management. That right, however, is negotiable to the extent that it does not prohibit the public employer from *Page 19 
performing the essence of its mission, something the minimum strength provision does not do. See Board of Education ofYonkers City School District v. Yonkers Federation of Teachers,353 N.E.2d 569, 573-574 (N.Y. 1976) (declaring public policy does not prevent public employer from agreeing to set size of work force during term of agreement); Police Bargaining Unit v. Borough ofMontoursville, 634 A.2d 830, 834 n. 8 (Pa. Cmwlth. 1993) (noting public employer may voluntarily agree to bargain over inherent management right). Accordingly, this Court finds that the Town's decision to bargain with the FOP and set the minimum size of its workforce — as opposed to setting a cap on employees, thus potentially limiting the Town's ability to perform its mission — is an acceptable subject of collective bargaining and disputes concerning the minimum workforce requirement are properly arbitrable.
In addressing the present argument — that a public employer cannot be bound by an agreement not to reduce the minimum size of its workforce — at a time when the financial situation of the city "was declared to be a disaster," the high court of New York said the following:
 "A job security provision insures that, at least for the duration of the agreement, the employee need not fear being put out of a job. Such absence of fear may be critical to the maintenance and efficiency of public employment, just as fear of inability to meet its debts may destroy the credit of the municipality. A job security clause is useless if the public employer is free to disregard it when it is first needed.
 * * * *
 Of course, collective bargaining agreements, and particularly job security clauses, do not derive from a `higher law' giving them a status denied to other public and contractual arrangements. . . . But the collective agreement in question, negotiated before a legislatively declared emergency, short-term in length, and indistinguishable from the city's other contractual obligations which remain enforceable, is not yet vulnerable to attack as in violation of public policy. *Page 20 
 Consequently, in this arbitration proceeding, the court has no power to pass upon the merits of the dispute. The merits are for the arbitrators to decide. It is also for the arbitrators to fashion the remedy appropriate to the circumstances, if it is determined that the agreement has been breached. In this context, of course, the financial condition of the city and its ability to fund the . . . positions are relevant and may be considered. But since there is no statute or controlling decisional law, or public policy prohibiting a public employer from voluntarily agreeing to a job security provision, the clause was valid and the parties should proceed to arbitration." Board of Education of Yonkers City School District v. Yonkers Federation of Teachers, 353 N.E.2d 569, 573-574 (N.Y. 1976).[10]
This Court concurs. Neither the Town's Charter nor the Town's inherent rights of management give the Town the right to unilaterally alter the size of its workforce in direct contravention of a collectively bargained contract provision. The decision of the Town to agree not to reduce its workforce during the terms of the controlling CBA does not preclude it from carrying out its statutory requirements, nor does it intrude on the essence of its mission in violation of Rhode Island decisional law. See Local 920,945 A.2d at 346 (holding decision to reduce workforce arbitrable during terms of collective bargaining agreement because not aimed at improving educational mission); City of Jersey City v.Jersey City Police Officers,713 A.2d 472, 482 (N.J. 1998) (holding that because city reorganized police department for help in crime fighting, and not primarily for fiscal reasons, city's action constituted inherent right of management).; see also Castelli v.Carcieri, 961 A.2d 277, 285 (R.I. 2008) (observing fiscal difficulties do not warrant upsetting plaintiffs' expectations created by fixed term agreement of continued employment). *Page 21 
If a public employer so desires, bargaining on the issue of minimum staff size can provide potential gain to an employer, allowing it to bargain for concessions from the union in areas otherwise not possible. See AFSCME v. State Labor RelationsBoard, 653 N.E.2d 1357, 1362 (App. Ct. Ill. 1995) (highlighting union concessions which could alleviate financial need for reduction in staff size). But see Paterson Police PBA Local No. 1 v. Cityof Paterson, 432 A.2d 847, 853 (N.J. 1981) (refusing to allow public employer right to bargain over staff size because of determination it placed substantial limitation on policy making authority). Undoubtedly, when the Town agreed to the current minimum workforce size, it determined that the number agreed upon appropriately provided for the bare needs of the community. Equally, the Town undoubtedly received a benefit for agreeing to such a provision, likely enticing the FOP to make concessions in another area. To that extent, this Court is confident that it cannot strip the FOP of the benefit of that bargain during the terms of the agreement. Thus, any action taken by the Town during the express terms of the CBA in violation of the minimum staffing provision may properly go to arbitration, as contemplated by the CBA and the MPAA.
Holding a party to an expressly agreed upon term — even when one side of the agreement finds that term unfavorable — keeps with the clear intention of the MPAA. The General Assembly limited the length of collective bargaining agreements between police and their public employer. Section 28-9.2-6 provides that unless otherwise agreed upon in writing, the terms of an agreement will not exceed one year, but that even if agreed to, never shall an agreement last beyond three years. Similarly, in enacting § 28-9.2-17, the General Assembly provided an express avenue to address changes to an agreed upon collectively bargained provision. When the MPAA is read in its entirety, it becomes apparent the General Assembly envisioned a collective bargaining process that provided flexibility if an agreed upon term proved unsuitable to either *Page 22 
party: agreements shall not last beyond three years, and at the conclusion of those three years, each party has an opportunity to propose changes to the agreement. The escape hatch for an unfavorable collectively bargained term — unless the term prevents the public employer from performing the essence of its mission or its statutory duties — is not undertaking unilateral action during the course of the contract and then seeking a declaratory judgment by this Court that the contract term is invalid.
When the terms of such agreement have expired, however, a different situation is presented. Preliminarily, after the contract term has run its course, neither party can claim that its legitimate expectations have been upset or that it did not receive the benefit of its bargain. Castelli v. Carcieri,961 A.2d 277, 285 (R.I. 2008) (comparing statutory term of ten year appointment to contractual term giving employees expectation of continued employment for ten years). Moreover, as previously mentioned, a public employer is "free to bargain or not to bargain,"Fibreboard, 379 U.S. at 402 (quoting Wooster Div. ofBorg-Warner Corp., 356 U.S. at 349, on issues "reserved to the discretion of management," Town of Narragansett,119 R.I. at 507, 380 A.2d at 521-22, assuming that the employer does not bargain away a statutory duty or the ability to make a decision which goes to the essence of its mission. This freedom to bargain, however, would ring hollow if a previous decision to bargain and agree on a matter properly classified as an inherent management decision turned the matter — in future bargaining sessions — from a permissive subject of bargaining into one that is mandatory. City of Center Line, 327 N.W.2d at 827 n. 5 (citingCity of Taunton v. Taunton Branch of the Massachusetts PoliceAss'n, 406 N.E.2d 1298, 1302 (Mass. Ct. Appeals 1980));Paterson Police PBA Local No. 1 v. City of Paterson,432 A.2d 847, 853 (N.J. 1981) (stating permissive item remains in effect only during term of the collective bargaining agreement);Yonkers Federation of Teachers, 353 N.E.2d 569, 573-574 *Page 23 
(suggesting job security provision did not provide employment protection past terms of agreement); Blount County Educ. Ass'n v.Blount County Bd. of Educ., 78 S.W.3d 307 (Tenn.Ct.App. 2002). Otherwise, an employer's concession involving an inherent management right could never be removed from the gambit of arbitration, a result not in accordance with Rhode Island decisional law.See Barrington School Committee v. Rhode Island State LaborRelations, 120 R.I. 470, 388 A.2d 1369 (1978) (interpreting Massachusetts decision comparing mandatory and permissive subjects of bargaining to decide if eliminating employment positions constituted condition of employment); Town of Narragansett v.International Association of Fire Fighters, AFL-CIO, Local1589, 119 R.I. 506, 380 A.2d 521 (1977) (holding arbitrator had authority to resolve dispute over minimum on duty fire station staffing because of impact on terms and conditions of employment).
Although our Supreme Court has "postulate[d] no general rule," it has embraced the notion that a distinction exists between permissive and mandatory subjects of bargaining. See BarringtonSchool Committee, 120 R.I. at 479, 388 A.2d at 1375 (interpreting Massachusetts decision comparing mandatory and permissive subjects of bargaining to decide if eliminating employment positions constituted condition of employment); Town of Narragansett,119 R.I. 506, 380 A.2d 521 (1977) (holding arbitrator had authority to resolve dispute over minimum on duty fire station staffing because of impact on terms and conditions of employment). The latter being subjects properly classified as affecting wages, hours, and other terms and conditions of employment, while the former is properly classified as "reserved to the discretion of management."Town of Narragansett, 119 R.I. at 507, 380 A.2d at 521-22. As the names suggest, an employer must bargain over mandatory terms, while it is "free to bargain or not to bargain," *Page 24 
over permissive terms. Fibreboard, 379 U.S. at 402 (quotingWooster Div. of Borg-Warner Corp., 356 U.S. at 349.
In Town of Narragansett v. International Association of FireFighters, AFL-CIO, Local 1589, our Supreme Court contemplated whether an arbitrator — in a dispute between a town and the bargaining agent for the town's firefighters — had the authority to resolve a bargaining impasse over the "minimum number of permanent employees on duty at all times in Station No. 1."119 R.I. 506, 507, 380 A.2d 521. To resolve the dispute, the Court had to determine if the stationhouse manning requirement was "reserved to the discretion of management," or encompassed by the firefighters' right to bargain collectively as to "wages, rates of pay, hours, working conditions and all other terms and conditions of employment." Id. at 507, 380 A.2d at 521-22. The Court determined that the issue — whether three or five firefighters would be employed at all times at the stationhouse — was "clear[ly] . . . within the purview" of required collective bargaining because of the affect on both workload and safety of the firefighters.Id. at 508, 380 A.2d at 522.
The Narragansett Court relied upon the persuasive force of precedent from both federal and state courts to reach its conclusion. Specifically, the Court relied upon Fire FightersUnion, Local 1186, International Association of Firefighters,AFL-CIO v. City of Vallejo. 526 P.2d 971 (Cal. 1974).[11] InVallejo, the California Supreme Court consistently praised the value and importance of arbitration, noting the "wisdom of judicial self-restraint in attempting prearbitral definitions of the scope of arbitration," and that courts "must be careful not to restrict unduly the Scope of the arbitration." With that backdrop, the California Supreme Court held that a *Page 25 
minimum station manning requirement was properly arbitrable because of its effect on workload and safety — and our Court agreed.
Our Supreme Court reached a similar result in BarringtonSchool Committee v. Rhode Island State Labor Relations,120 R.I. 470, 388 A.2d 1369 (1978). In Barrington, our Supreme Court reviewed a Superior Court decision holding that a school committee had the authority to unilaterally eliminate twelve departmental chairmanship positions in the school system. The Superior Court held that, after the collective bargaining agreement covering the parties had expired, the school committee had no obligation to bargain with the union over the decision because "as a matter of law [] the reorganization was not a mandatory subject of collective bargaining."Id. at 471, 388 A.2d at 1371.
Our Supreme Court disagreed. Again our Supreme Court noted relevant precedent from federal and state cases. It noted that a similar Massachusetts Supreme Judicial Court case had dealt with a similar issue, and quoted from the opinion, noting that the Court did not allow an arbitrator to restore the downgraded employee to his previous position, but that the issue was negotiable to the extent that the "abolition of [the] employee's position, his transfer to a lesser position, and reduction of his salary involved his `wages, hours and other conditions of employment.'"Id. at 478, 388 A.2d 1374 (quoting School Committee v.Raymond, 343 N.E.2d 145, 148 (Mass. 1976). Apparently adopting this position, our Supreme Court reversed the Superior Court's finding, reasoning that "the abolition of the 12 department chairmanships is not completely a matter of educational policy but is an appropriate matter for negotiating or bargaining concerning the effect on the individual teachers involved."Barrington, 120 R.I. at 479, 388 A.2d at 1375. Our Court concluded by stating:
 "We do not mean that the union should be able to dictate to the committee on matters strictly within the province of management. *Page 26 
What we do say is that when, as here, the problem involved concerns both a question of management and a term or condition of employment, it is the duty of the committee to negotiate with the individual teachers involved." Id.
Currently, the Town is attempting to reduce the size of its workforce through attrition. The time frame and specifics of the actions taken by the Town, which the FOP allege violates the minimum workforce size provision of the CBA, are not set forth in detail before this Court. To the extent that the actions took place during the specific three year time frame expressly provided by the CBA, the Union may seek resolution of its grievance through arbitration. Similarly, to the extent that the Town undertook unilateral action after the expiration of the CBA without "propos[ing] a change" to the minimum workforce provision, an arbitrator is the appropriate authority to resolve the grievance.See § 28-9.2-17. However, after the Town has notified the Union that it no longer intends to be bound by the minimum workforce size provision, an arbitrator would not be appropriate to resolve the bargaining dispute because setting the size of the police workforce through attrition is a subject "reserved to the discretion of management."[12] *Page 27 
The Town must bargain, however — and an arbitrator would therefore certainly have the authority to resolve — how the effects of the new workforce size impact hours, wages, and terms and conditions of employment of the remaining FOP members.
This Court is keenly aware of both the benefits and public policy in favor of arbitration and the limited role courts should play in the arbitration process. See § 28-9-4 (directing courts to stay proceedings on issues that are "referable to arbitration");Purvis Systems, Inc. v. American System Corp.,788 A.2d 1112, 1114 (R.I. 2002) (recognizing judiciary's limited role in arbitration process). Nonetheless, the decision to set the size of the workforce is not a recognized right of labor, and an employer's decision to do so is not encompassed by the broad grant of power the General Assembly has given to police unions allowing them to force bargaining over hours, wages, and other terms and conditions of employment.See § 28-9.2-2, and § 28-9.2-4.
Indeed, unlike the decision of minimum on-duty staffing, other courts, including the Vallejo Court relied upon by our Supreme Court in Narragansett — despite the Vallejo Court's broad proclamations about the benefits of arbitration — have recognized that "[a] reduction of the entire fire fighting force based on the city's decision that as a matter of policy of fire prevention the force was too large would not be arbitrable." Vallejo,526 P.2d at 980. This belief has been echoed by state courts throughout the country. See, e.g., Webster Education Ass'n v.Webster School District #18-4, 631 N.W.2d 202, 206-07 (S.D. 2001) (observing school district had sole discretion in initial decision to reduce force); Int'l Ass'n of Firefighters, Local 1052 v.Public Employment Relations Commission,778 P.2d 32, 36 (Wash. 1989) (noting law is clear that general staffing levels are managerial prerogative); School Committee ofNewton v. Labor Relations Commission,447 N.E.2d 1201, 1207 (Mass. 1983) (stating decision to reduce level of *Page 28 
janitorial services is exclusive management prerogative);Metropolitan Council No. 23 and Local 1277, AFSCME, AFL-CIO v.City of Center Line, 327 N.W.2d 822, 823 (1982) (holding initial decision of layoffs not subject to mandatory bargaining); Cityof Atlantic City v. Laezza, 403 A.2d 465, 471 (N.J. 1979) (noting discretion to diminish the size of the work force is unquestionably a managerial function which cannot be delegated to an arbitrator);City of Brookfield v. Wisconsin Employment RelationsCommission, 275 N.W.2d 723, 726 (Wis. 1979) (holding during negotiations employer free to make decision setting level of services it will provide). The FOP's contention that the motivation of the employer in reducing the size of the workforce is a necessary component of a court's analysis as to whether the employer can take such unilateral action is partially accurate. As Local 920
demonstrated, an employer cannot unilaterally reduce the size of the workforce — thereby increasing the workload of the remaining employees — for fiscal reasons in violation of the terms of a current collective bargaining agreement. The Local 920
decision does not stand for the proposition, however, that once a public employer agrees with the union to set the minimum size of its workforce at a certain figure — an inherent right of management — that it can be forced to bargain over that issue in future bargaining sessions. A public employer can, however, be forced to bargain on the impact of the decision to change the size of the workforce on the remaining employees. ProvidenceHosp., 93 F.3d at 1018; Barrington,120 R.I. at 479, 388 A.2d at 1375 (noting employer must bargain with individual affected employees); see also School Committeeof Newton, 447 N.E.2d at 1207 (noting means of achieving force reduction and impact on terms and conditions of employment is subject to collective bargaining); City of Center Line,327 N.W.2d at 823 (mandating city bargain with police over effects of layoffs); City of Brookfield, 275 N.W.2d at 726 (noting court takes the middle ground, allows employer to make decision but mandates *Page 29 
bargaining over effects of its decision); City of Vallejo,526 P.2d at 980 (requiring city to negotiate with union to determine how staff reduction impacts workload and safety).
Indeed, the decision to bargain over the effects of the work force reduction is the path suggested by our Supreme Court inBarrington. In Barrington, our Supreme Court did not allow the school committee to unilaterally reorganize the junior high school and high school without "negotiate[ing] with the individual teachers involved." Barrington,120 R.I. at 479, 388 A.2d at 1375. In Barrington, the "individual teachers involved" were the twelve employees who were directly being demoted and losing their status as a department chair. Like the Barrington Court, this Court recognizes the importance of negotiating with the employees directly involved in the decision. Unlike in Barrington, however — because currently the Town is reducing force through attrition — the decision itself only tangentially impacts the remaining FOP members and those members have the right to negotiate as to that tangential impact. Thus, the Town can unilaterally decide to reduce the size of its workforce, but it must bargain, and an arbitrator has the authority to resolve, how the workforce reduction affects hours, wages, and terms and conditions of employment. Included in this bargaining is the right of the FOP to bargain over how the decision impacts the superior officer complement of the force.
 Conclusion
Accordingly, this Court denies Plaintiff's request for a declaration it may unilaterally establish the size and superior officer complement of its police department in contravention of its agreement to refrain from making such changes during the terms covered by the agreement. Having decided that arbitration is the appropriate venue for the contractual dispute, the Court need not address FOP's "Contract Clause" claim. This Court does declare, however, pursuant to § 9-30-1, that the Town's ongoing duty to bargain over the minimum size of the workforce is an *Page 30 
inherent right of management reserved to the discretion of the Town. After the CBA term has expired and the Town has given notice that it no longer intends to be bound by the minimum workforce requirement, the Town's duty to bargain over the issue is mandatory and arbitrable only insofar as the decision to reduce the workforce affects hours, wages, and other terms and conditions of employment of the remaining employees. Counsel shall confer and submit forthwith to this Court for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] The CBA governing the FOP and Town commenced July 1, 2006 and ended June 30, 2009. Both parties stipulate, however, that the fact that the CBA has expired should not prevent this Court from reaching the merits, and this Court agrees. G.L. 1956 § 28-9.2-17 provides,
 [a]ll contractual provisions contained in a collective bargaining agreement entered into pursuant to the provisions of this chapter shall continue in the following collective bargaining agreement unless either the bargaining agent or the corporate authority shall, in writing, within the thirty (30) day period referred to in § 28-9.2-7, propose a change in any contractual provisions.
The Town has not asserted that it has requested a change of the contested CBA provision pursuant to the statutory framework. Additionally, unlike the collective bargaining provision in City of Cranston v. Rhode Island Laborers' Dist. Council Local1033, which contained a sunset clause, the current CBA provision does not, and therefore, a present controversy exists as to whether the parties are bound by the CBA provision in dispute. 960 A.2d 529, 535 (R.I. 2008) (holding case moot because collectively bargained job security provision ended pursuant to express sunset clause).
[2] Our Supreme Court construes the Municipal Police Arbitration Act and Fire Fighters Arbitration Act under the same legal analysis.City of East Providence v. Local 850, Intern. Ass'n ofFirefighters, 117 R.I. 329, 366 A.2d 1151 (1976).
[3] In construing a home rule charter provision similar to the present, Justice Flaherty observed that the city was "hang[ing] its hat on language . . . that lies somewhere between the amorphous and the aspirational, but in no way . . . conflict[ing] with the municipality's specific obligations under both the collective-bargaining agreement and Rhode Island's Municipal Employees' Arbitration Statute." City of Cranston v. Rhode IslandLaborer's District Council, Local 1033,960 A.2d 529, 547 (R.I. 2008) (Flaherty, J., dissenting) (addressing merits of the dispute despite majority refusing to do so because issue moot).
[4] It would certainly appear, as the Superior Court noted inCentral Falls School District v. Central Falls Teachers'Union, that the reasoning of Jacinto, which was established in the Belanger v. Matteson case, has been overruled "sub silencio [and the Court] has adopted the rationale of Justice Paolino in dissent." Central Falls School District v.Central Falls Teachers' Union,2008 WL 4176770 (R.I. Super. Ct. Aug. 7, 2008).
[5] In addition to other enumerated rights, G.L. 1956 § 16-2-9(a) provides that, "[t]he entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns."
[6] Sections 36-11-1(a) and 36-11-7 give state workers the right to collectively bargain and enter into agreements over hours, wages, and terms and conditions of employment.
[7] Despite citing extensively to the dissent of Justice Paolino in Belanger v. Matteson, the Court also cited BarringtonSchool Committee v. Rhode Island State Labor Relations Board, quoting from the decision in a parenthetical to note that, "in the context of interest arbitration, `when the problem involved concerns both a question of management and a term or condition of employment, it is the duty of the committee to negotiate with the teachers involved.'" State Dept. of Mental Health,692 A.2d at 323-24 (quoting Barrington School Committee v. RhodeIsland State Labor Relations Board,120 R.I. 470, 479-80, 388 A.2d 1369, 1375 (1978)).
[8] "`Crossing the Rubicon' alludes to the illegal crossing of the Rubicon River in northern Italy by Caesar and his army to make their way to Rome — a crossing by which Caesar committed his troops irrevocably to a risky and revolutionary course of action and inevitable armed conflict. According to the historian Suetonius, Caesar there uttered the famous phrase `alea iacta est' — `the die is cast.' To `cross the Rubicon' is to `pass the point of no return.'" Central Falls School District v. Central FallsTeachers' Union,2008 WL 4176770 (R.I. Super. Ct. Aug. 7, 2008) (citations omitted).
[9] This Court notes that a school committee likely has broader authority to control a school than a town has to run its police department. School committees maintain "expansive powers over education." Local 920, 945 A.2d at 347. Conversely, the "state maintains sovereignty [over] the regulation of police officers."McCarthy, 574 A.2d at 1231. Although the state ceded some of that authority to the Town when it amended the Charter in its entirety in 1973, it cannot be gainsaid the state gave the Town more authority than school committees have pursuant to § 16-2-1 et seq. See Bertrand v. DiCarlo,111 R.I. 509, 513, 304 A.2d 658, 660 (1973) (providing legislative grant of municipal power strictly construed).
[10] It is well settled that this Court can look to our sister states for guidance when addressing similar issues. Berman v.Sitrin ___ A.2d ___, 2010 WL 1555365 (R.I. 2010) (noting persuasive case law from sister states).
[11] The Court also cited to the previously mentioned seminal United States Supreme Court decision of Fibreboard Paper ProductsCorp. v. N.L.R.B., 379 U.S. 203 (1964).
[12] This Court is mindful of the exceedingly broad language of § 28-9.2-17, providing that, "any and all unresolved issues shall be submitted to arbitration." Our Supreme Court, however, has never interpreted the language so broadly, undoubtedly recognizing the internal inconsistency of submitting any and all issues to arbitration when the matter unresolved is "reserved to the discretion of management." Town of Narragansett v. InternationalAssociation of Fire Fighters, AFL-CIO, Local 1589,119 R.I. 506, 507, 380 A.2d 521 (1977). Indeed, our Supreme Court has quoted from Justice Paolino's dissent in State Dept. ofMental Health, Retardation, and Hospitals V. R.I.Council 94, A.F.S.C.M.E., AFL-CIO, stating that "[i]t is incumbent upon the courts to render an interpretation of the terms conditions of employment and policy whenever a matter is presented which does not clearly belong in one class or the other."692 A.2d 318, 323 (R.I. 1997) (quoting Belanger v. Matteson,115 R.I. 332, 346 A.2d 124 (1976) (Paolino, J., dissenting) (alterations in original omitted). Notably, however, the Court in State Dept.of Mental Health also cited to the Barrington decision, highlighting that in the case of interest arbitration, the public employer must negotiate with the individual employees affected by the decision. State Dept. of Mental Health,692 A.2d at 323. This Court interprets that to mean that while the public employer may have the right to make the decision if it is appropriately classified as reserved to the discretion of management; it has to engage in effects bargaining.