CITY OF BROOKFIELD, Respondent, v. WISCONSIN EM-
PLOYMENT RELATIONS COMMISSION, Appellant.

Supreme Court

*No. 76–184. Argued November 28, 1978.—
Decided February 27, 1979.*
(Also reported in 275 N.W.2d 723.)

For the appellant the cause was argued by *John D.
Niemisto,* assistant attorney general, with whom on the
brief was *Bronson C. La Follette,* attorney general.

For the respondent there was a brief by *George A. Schmus*, city attorney, and *Edward A. Hannan* and *Hayes & Hayes*, of counsel, and oral argument by *Tom E. Hayes*, all of Milwaukee.

For intervenor-appellant, Local No. 2051, International Association of Firefighters, AFL–CIO, there were briefs by *Richard V. Graylow* and *Lawton & Cates* of Madison, and oral argument by *Mr. Graylow*.

Amicus Curiae brief on behalf of The League of Wisconsin Municipalities was filed by *Jean G. Setterholm*, legal counsel, and *Burt P. Natkins*, assistant legal counsel.

COFFEY, J. This is an appeal of a July 16, 1976 judgment that reversed an April 16, 1975 order of the Wisconsin Employment Relations Commission (hereinafter WERC). The appellant, WERC, ordered the respondent, City of Brookfield (hereinafter Brookfield) to reinstate and reimburse five city firefighters laid off due to a decrease in the funds allocated to the fire department by the city budget. The ordered remedy was based upon the WERC's finding that Brookfield in the 1973 bargaining agreement had violated its duty to collectively bargain when it refused to negotiate the decision to lay off the five firefighters or the effects of the lay off decision, contrary to sec. 111.70 (1) (d), Stats. The circuit court reversed the WERC order and found that Brookfield was not required to negotiate the lay off decision; the WERC conclusion in regard to the duty to bargain the effects of the lay off decision was affirmed and is not at issue in this appeal.

The parties do not dispute the facts of this case. Prior to and including the calendar year 1972 Brookfield and Firefighters Local 2051, International Association of Firefighters, AFL–CIO (hereinafter Local 2051) were parties to collective bargaining agreements. The 1972 agreement did not contain a minimum daily manpower

clause as proposed by Local 2051, nor a specific waiver of bargaining clause, a management's rights clause or a lay off of unit employees clause.

Mike Sueflohn, a department fireman and member of Local 2051's bargaining team, testified before the WERC hearing examiner that as early as October 2, 1972 the possibility of personnel reductions, numbering 5 fire-fighters, was discussed. According to Sueflohn, the Brookfield bargaining representative described the city's financial condition as "very tight."

During the negotiations for the 1973 collective bargaining agreement, Local 2051 again requested a minimum manpower clause. Brookfield representatives told the union that the subject was not negotiable. At the November 13, 1972 bargaining session, Local 2051 demanded the discussion of bargaining proposals concerning the possibility of lay offs in the department. Brookfield's bargaining agent rejected the proposal, countering with the argument that any decision regarding lay off was an inherent right reserved to management.

On November 14, 1972 the Brookfield City Council reduced the fire department's 1973 budget allocation by $80,000. The budgets of other city departments were also reduced. The city council requested department heads to submit proposals on how these budget reductions could be met. The fire chief suggested personnel lay offs and also expressed concern over the reduction in the quality of services provided. Members of Local 2051 were aware of the anticipated lay offs resulting from the $80,000 budget cut and, in the words of Mike Sueflohn, "tried very hard through the news media and other avenues (distribution of fliers and newsletters) open to us to educate citizens of the city what was going to happen to their fire service." The fliers that were distributed were designed to encourage Brookfield residents to attend and voice an opinion at a city council meeting on

November 28, 1972 at which time the $80,000 budget cut would be discussed and implemented by lay offs or other appropriate action. The fliers read in part:

"BROOKFIELD LIVES AND PROPERTY IN JEOPARDY . . . UNLESS YOU SAY NO!

"The proposal to cut firefighters from the department means placing your family life in danger, higher homeowners and business insurance rates.

"Learn the facts about what this proposal really means by attending a public meeting.

"PLEASE ATTEND . . . for your FAMILY'S SAKE.

"Citizens Committee to Protect Brookfield, Dr. R. A. Toepfer, Mr. & Mrs. David Ninstil and Brookfield Fire Fighters Association."

Local 2051 efforts to prevent the lay off of firemen were unsuccessful, despite the appearance at the November 28th city council meeting of 17 people who spoke on behalf of Local 2051. Speaking against the cut in manpower was John Pavlik a former fire chief.

The city council's action on November 28th was described in a Local 2051 newsletter in the following language:

"CITY OF BROOKFIELD VOTES TO LAY OFF FIRE FIGHTERS: Despite strong efforts of Local 2051, with the help of the IAFF and their neighboring locals, the Aldermen voted 8 to 5 to cut 6 men from the Fire Department. This means the 6 men hired just 2½ years ago to man a new Aerial will be put out of a job as will the Aerial as a first line rig.

"All department heads had been told to cut their budgets, but only the Fire Chief submitted a proposal on how it could be done. He later pointed out that this was not good for the fire protection, but the Finance Committee had by then taken a public stand and we all know how politicians hate to admit they may have been wrong."

At the contract bargaining session on December 5th Local 2051 asked for the discussion of severance pay for the five firefighters who were about to be laid off. The

Brookfield representative stated that the matter would have to be considered by the city finance committee. A committee member had previously stated during the negotiation sessions that because of the city's financial crunch, he was going to propose a return to an all volunteer fire department. On December 8, 1972 Brookfield notified the five firefighters of lowest seniority that they would be laid off effective December 31, 1972. At the December 13, 1972 bargaining conference, a city representative stated that no unemployment benefits would be accorded and that the matter was not negotiable as it was a management prerogative. The five firefighters were laid off on December 31, 1972 without any collective bargaining discussion as to the decision or the implementation of the lay offs. On that date, the number of employees on a twenty-four hour shift was reduced from 15 employees to 13.

Local 2051 filed separate unfair labor practice complaints with the WERC and a hearing examiner was subsequently appointed. This complaint alleged that Brookfield refused to negotiate the lay off decision and, secondly, they refused to bargain the impact of the decision in violation of sec. 111.70(1)(d), Stats., of the Municipal Employment Relations Act (hereinafter M.E.R.A.). The complaints were consolidated for hearing on January 15, 1973. At the initial hearing Brookfield offered to negotiate the effects of the lay offs but Local 2051 refused, except on its own terms—specifically that Brookfield would agree to reinstate and make whole the laid off employees. The WERC hearing examiner made the following findings of fact regarding the Brookfield offer and Local 2051's refusal:

"16. That during the hearing in the instant case conducted on January 15, 1973, Respondent [Brookfield] offered to bargain about its decision to lay off the five unit employes in issue and the effects of that decision

upon bargaining unit personnel; that in response to said offer, the Complainant, [Local 2051] during the same hearing, refused to enter into negotiations proposed by the Respondent unless the Respondent was willing to resinstate and make whole the laid-off employes; and that the Respondent thereupon expressed its unwillingness to so reinstate and make whole said employes."

Brookfield rejected Local 2051's counterproposal.

On October 30, 1973 a WERC hearing examiner found Brookfield in violation of M.E.R.A. for its refusal to bargain the lay off decision or its effect. Brookfield appealed the examiner's findings and on April 16, 1975 a WERC panel adopted the findings and conclusions of the hearing examiner. The WERC ordered Brookfield to reinstate and reimburse the five firefighters laid off because of the budget reduction. The ordered remedy was based upon the WERC findings and conclusions that Brookfield, contrary to sec. 111.70(1)(d) of M.E.R.A. had violated its duty to collectively bargain the lay off decision and its effects, subjects which the WERC reasoned were directly and intimately related to wages, hours and conditions of employment and not reserved as a management prerogative. The circuit court reversed the WERC order and remedy, finding that Brookfield was not required to negotiate the lay off decision but did, however, affirm the WERC conclusion that Brookfield had violated its duty to bargain the impact of the lay off decision. The circuit court rationale was stated in the following language:

"In *Libby*[1] our Supreme Court held that decisions of management which lie at the core of entrepreneurial control are not subject to collective bargaining. The results of such decisions, however, are. Section 111.70(1)(d) requires a municipality by statute to do what the Court

[1] *Libby, McNeil & Libby v. WERC*, 48 Wis.2d 272, 280, 179 N.W.2d 805 (1970).

directed *Libby* to do by decision. The City must bargain merely over the effects of changes in municipal direction. Public policy considerations similar to those that occupied our Supreme Court in *Libby* are present here; namely, the necessity to preserve the freedom of municipal government, representing its citizens, to determine the level of public services to be provided, contrasted with the purposes of the Municipal Employers Relations· Act in promoting the peaceful settlement of muncipal labor disputes. Our Supreme Court has taken a middle ground. The employer may make the decision, but must bargain over its effect on the wages, hours, and working conditions of the employee. This Court follows that lead: The City may, in its sole capacity, determine the level of service it will provide, even though this will affect the wages, hours, and working conditions of its employees. The City must, however, bargain with the Union over the effect of its decision."

Thus, the two issues presented are:

1. Whether an economically motivated decision to lay off five firefighters as a means to implement a fire department budget reduction is a mandatory subject of collective bargaining pursuant to sec. 111.70(1)(d), Stats., of the Municipal Employment Relations Act?

2. Is the commission's order providing remedies for the respondent's failure to collectively bargain in violation of sec. 111.70(1)(d), Stats., reasonable and appropriate under the circumstances?

This appeal challenges a municipality's decision to lay off five union firefighters due to a cut in the department budget. Local 2051 (firefighter's union) maintains that budget related lay offs are a mandatory subject of bargaining pursuant to sec. 111.70(1)(d), Stats., as a matter affecting wages, hours and conditions of employment. The city of Brookfield contends that the lay off decision is a management prerogative by virtue of its municipal powers vested in ch. 62, Stats. Consequently, this case will be decided upon the statutory interpretation the

WERC gave to sec. 111.70(1)(d) and ch. 62, and whether it was appropriate in the particular fact situation.

In dealing with this subject the court must determine which reviewing standards used to interpret sec. 111.70 (1)(d) are appropriate herein. In *Unified School District No. 1 of Racine County v. WERC*, 81 Wis.2d 89, 259 N.W.2d 724 (1977) the court discussed the standard of review applicable to WERC decisions dealing with mandatory bargaining and stated:

"Because the case raised 'very nearly questions of first impression,'[2] this court held that it was 'not bound' by the Commission's interpretation of the statute, although the Commission's decision would have 'great bearing' on the court's decision, and would be accorded 'due weight.' *Beloit Education Asso., supra*, at 68. As in the *Beloit Case*, because of the limited experience of the Commission with the questions presented, and their strictly legal nature, it is appropriate for this court to reach an independent determination of the intent and meaning of the statute, giving due weight to the decision of the Commission." *Id*. at 93.

Thus, in this problem area the court finds it necessary to undertake an independent judicial inquiry into the proper construction of sec. 111.70(1)(d), Stats., and its impact on the exercise of municipal powers enumerated in ch. 62. A question of interpretation confronts this court to determine whether or not the commission's competence or expertise extends beyond ch. 111. This court in *Glendale Professional Policemen's Assoc. v. Glendale*, 83 Wis.2d 90, 264 N.W.2d 594 (1978) dealt

___

[2] In *Beloit Education Asso. v. WERC*, 73 Wis.2d 43, 242 N.W.2d 231 (1976) this court found a teachers' union's seniority proposal in the event of lay off due to declining pupil enrollment to be a mandatory subject of bargaining. This holding is distinguishable from the case at bar inasmuch as *Beloit* did not address the issue of whether the initial decision to implement lay offs is a mandatory, permissive or prohibited subject of bargaining. It appears this appeal presents "very nearly questions of first impression." *Id*. at 68.

with the harmonizing of sec. 111.70 (1) (d) and sec. 62.13, as to whether a promotion of a police officer within the department was enforceable through the collective bargaining agreement. This court answered the question regarding the commission's expertise in the following language:

"In the typical case, the application of sec. 111.70–77, Stats., to a particular labor dispute requires the expertise of the Commission, the agency primarily charged with administering it. Here the question does not concern the application of a labor statute but the Commission's power to enforce it in the first instance in the light of another state statute. This issue, for relationship between two state statutes, is within the special competence of the courts rather than the Commission, and therefore this court need not give great weight to the arbitrator's determination of the issue." *Id.* at 100–01.

We are persuaded by the *Glendale* reasoning that the WERC should not be accorded the authority to interpret the appropriate statutory construction to ch. 62, Stats. The general charter law for cities as recited in ch. 62 deals solely with the powers and privileges of municipalities to promote the general welfare, peace, good order and prosperity of its inhabitants. These objectives are accomplished by the enactment of charter and general ordinances dealing with finance, public works, zoning, safety and building codes, annexations, etc. Thus, the exclusive grant of authority to municipalities in ch. 62 is far afield from the powers and limitations in the area of labor relations as enumerated in secs. 111.70–77. Accordingly, a question of a strictly legal nature is presented. This court in *Whitefish Bay v. WERB*, 34 Wis. 2d 432, 149 N.W.2d 662 (1967) eloquently pointed out the limitations on the interpretation of statutes by an administrative agency and the agency's void of legal expertise and knowledge when it stated:

" 'In view of this poverty of administrative experience and of the recent passage of the statute giving rise to this strictly legal question of jurisdiction, perhaps the court ought to examine it afresh as a question of law not especially involving administrative expertise. For such a question the court feels free to substitute its own judgment for that of the administrative agency.' Citing *Pabst v. Department of Taxation* (1963), 19 Wis.2d 313, 323, 120 N.W.2d 77." *Id.* at 444–45.

This case is an instance where the circuit court, now with this court's approval, is placing a limitation on the attempt of the WERC to expand its scope of authority beyond the limits of the legislative enactment contained in ch. 111. In like situations, WERC's statutory interpretations beyond the field of labor law will not be entitled to persuasive or substantial weight.

Sec. 111.70(1)(d), Stats., is controlling upon the duty to collectively bargain between a municipality and its public employees, and reads:

" 'Collective bargaining' means the performance of the mutual obligation of a muncipal employer, through its officers and agents, and the representatives of its employes, to meet and confer at reasonable times, in good faith, with respect to wages, hours and conditions of employment with the intention of reaching an agreement, or to resolve questions arising under such an agreement. The duty to bargain, however, does not compel either party to agree to a proposal or require the making of a concession. Collective bargaining includes the reduction of any agreement reached to a written and signed document. The employer shall not be required to bargain on subjects reserved to management and direction of the governmental unit except insofar as the manner of exercise of such functions affects the wages, hours and conditions of employment of the employes. In creating this subchapter the legislature recognizes that the public employer must exercise its powers and responsibilities to act for the government and good order of the municipality, its commercial benefit and the health, safety and welfare of the public to assure orderly operations and functions within its jurisdiction, subject to those rights

secured to public employes by the constitutions of this state and of the United States and by this subchapter."

As stated in sec. 111.70(1)(d) a mandatory subject of bargaining is a matter which affects "wages, hours and conditions of employment." The statute also provides for a public sector "management rights" clause guaranteeing as a management prerogative the exercise of municipal powers and responsibilities in promoting the health, safety and welfare for its citizens. Unless the bargaining topic affects "wages, hours and conditions of employment" a municipality is not compelled to collectively bargain but may choose to if not expressly prohibited by legislative delegation. Obviously, it is not the intent of the legislature to permit the elasticity of the phrase "bargaining topics affecting wages, hours and conditions of employment" to be stretched with each and every labor question.

In *Beloit Education Asso. v. WERC, supra* at 54, the court held that a mandatory subject of bargaining was distinguished from a permissive subject of bargaining if the topic "primarily" or "fundamentally" related to wages, hours and conditions of employment, now known as the "primary relation test." The primary relation test reflects a substantial change in public sector labor law. Prior to the *Beloit* case, mandatory and permissive subjects were delineated in the private sector "change of direction" test. This rule of law was adopted by the court in 1970 wherein *Libby, McNeill & Libby v. WERC, supra,* recited ". . . . most management decisions which change the direction of the corporate enterprise, involving a change in capital investment, are not bargainable." *Id.* at 282. In *Unified School Dist. No. 1 of Racine County v. WERC, supra* at 96, it was reasoned that the primary relation test rather than the change of direction standard better encompassed the inherent differences between public and private sector bargaining. *See* Weisberger, *The Appropriate Scope of Mandatory Bargaining*

*in the Public Section: The Continuing Controversy and the Wisconsin Experience,* 1977 Wis. L. Rev. 685, 694–99. The *Racine County* decision emphasized that:

"[I]n the public sector, the principal limit on the scope of collective bargaining is concern for the integrity of political processes." *Unified School Dist. No. 1 of Racine County v. WERC, supra* at 96.

We hold that economically motivated lay offs of public employees resulting from budgetary restraints is a matter primarily related to the exercise of municipal powers and responsibilities and the integrity of the political processes of municipal government. The citizens of a community have a vital interest in the continued fiscally responsible operation of its municipal services. Thus, it is imperative that we strike a balance between public employees' bargaining rights and protecting the public health and safety of our citizens within the framework of the political and legislative process.

Ch. 62, Stats., which enumerates legislatively delegated municipal powers and obligations mandates this result and recites in its relevant portions:

"(5) POWERS. Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, *and shall have power to act for the government and good order of the city,* for *its commercial benefit, and for the health, safety, and welfare of the public,* and may carry out its powers by license, regulation, suppression, borrowing of money, *tax levy,* appropriation, fine, imprisonment, confiscation and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, *and shall be limited only by express language.*" Sec. 62.11, Stats. (Emphasis supplied.)

"(5m) DISMISSALS AND REEMPLOYMENT. (a) When it *becomes necessary, because of need for economy, lack of work or funds,* or for other just causes, *to reduce the*

*number of subordinates,* the emergency, special, temporary, part-time, or provisional subordinates, if any, shall be dismissed first, and thereafter subordinates shall be dismissed in the order of the shortest length of service in the department, provided that, in cities where a record of service rating has been established prior to January 1, 1933, for the said subordinates, the emergency, special, temporary, part-time provisional subordinates, if any, shall be dismissed first, and thereafter subordinates shall be dismissed in the order of the least efficient as shown by the said service rating." Sec. 62.13(5m)(a), Stats. (Emphasis supplied.)

This court has held that sec. 111.70, Stats., should be harmonized with existing statutes when possible, inasmuch as sec. 111.70 "is presumed to have been enacted with full knowledge of the pre-existing statutes and that construction should give each section force and effect." *Glendale Professional Policemen's Assoc. v. Glendale, supra,* citing *Muskego-Norway C. S. T. S. D. No. 9 v. WERB,* 35 Wis.2d 540, 556, 151 N.W.2d 617 (1967). In fulfilling the exclusive judicial role of interpreting and harmonizing diverse statutes as ch. 62 and 111.70(1)(d), we adhere when possible to the express legislative policy stated in sec. 62.04.

"**Intent and construction** . . . For the purpose of giving the cities the largest measure of self-government compatible with the constitution and general law, it is hereby declared that sections 6201 to 62.26, inclusive, *shall be liberally construed in favor of the rights, powers, and privileges of cities to promote the general welfare, peace, good order and prosperity of such cities and the inhabitants thereof."* (Emphasis supplied.)

Ch. 62, Stats., requires that the city of Brookfield and other municipalities possess the power to decide when a lay off is necessary in order to secure the policy objectives of the community's citizenry as spoken through the actions of its duly elected representatives. The residents of Brookfield through their elected representatives

on the city council requested city budget reductions. Unquestionably, fewer firefighters will reduce the level and quality of services provided, but this is a policy decision by a community favoring a lower municipal tax base. Ch. 62 does not expressly prohibit the topic of economically motivated lay offs from becoming a permissive subject of collective bargaining, but the decision to discuss the topic at a bargaining table is a choice to be made by the electorate as expressed through its designated representatives and department heads.

This court's concern for the maintenance of the municipalities' political processes was forcefully stated in *Unified school Dist. No. 1 of Racine County v. WERC*, *supra* at 99–100.

"As a public body composed of elected officials, a school board is vested with governmental powers and has a responsibility to act for the public welfare. The United States Supreme Court recognized this responsibility in *Hortonville Jt. School Dist. No. 1 v. Hortonville Ed. Asso.*, 426 U.S. 482, 495, 496, 96 S. Ct. 2308, 49 L. Ed.2d 1 (1976).

" 'State law vests the governmental, or policymaking function exclusively in the School Board. . . . [T]he Board is the body with overall responsibility for the governance of the school district; it must cope with the myriad day-to-day problems of a modern public school system. . . ; by virtue of electing them the constituents have declared the Board members qualified to deal with these problems, and they are accountable to the voters for the manner in which they perform. . . .'

"In municipal employment relations the bargaining table is not the appropriate forum for the formulation or management of public policy. Where a decision is essentially concerned with public policy choices, no group should act as an exclusive representative; discussions should be open; and public policy should be shaped through the regular political process. Essential control over the management of the school district's affairs must be left with the school board, the body elected to be responsible for those affairs under state law."

The court recognizes that unions, such as Local 2051, are not powerless in their ability to formulate and influence the direction of public policy decisions. As demonstrated in this case, unions can and do attend public budget meetings and can and do lobby with legislative bodies and organize and motivate the general public regarding the union's position. The distribution of informational fliers, newsletters and media releases as well as the solicitation of prominent and influential speakers are but a few of the ways in which unions can and do have a significant impact on the political processes. Local 2051 exerted acceptable political pressures upon the Brookfield City Council to halt the lay offs resulting from the budget cut. To decide the issue to be a mandatory subject of bargaining would destroy the equal balance of power that insures the collective bargaining rights of the union and protects the rights of the general public to determine the quality and level of municipal services they consider vital. The legislature has made it clear that a budgetary lay off decision is not a subject of mandatory bargaining. If it were, the right of the public to voice its opinion would be restricted as to matters fundamentally relating to the community's safety, general welfare and budgetary management.

While not at issue in this case, we add that the trial court correctly determined that the issue as to the effects of the lay offs was a mandatory subject of bargaining. A reduction in the total work force caused by the economically motivated lay offs will affect the number of employees assigned to a particular shift and thus alter their individual fire fighting responsibilities. Therefore, there is a primary relation between the impact of the lay off decision and the working conditions of the remaining unit employees. Brookfield, after initially refusing to discuss the issue, made an offer to do so on January 15, 1973. We view with disfavor Local 2051's refusal to bargain the effect of the lay offs unless the

five firefighters were returned to work and reimbursed for lost time.

In reaching our decision, we deem it important that the Brookfield City Council made the specific decision that the budget cuts would be implemented by personnel lay offs pursuant to its powers. Our decision does not reinstate the WERC ordered remedy of re-employment for the five laid off firefighters and reimbursement of back wages. Therefore, we do not reach the second issue of whether the award was reasonable and appropriate under the circumstances.

*By the Court.*—Judgment affirmed.