FILED

06/30/2025

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2025 Session

## CLARKSVILLE MONTGOMERY COUNTY EDUCATION ASSOCIATION v. CLARKSVILLE MONTGOMERY COUNTY BOARD OF EDUCATION

Appeal from the Chancery Court for Montgomery County
No. MC-CH-CV-PP-20-2    Ben Dean, Chancellor

_____

### No. M2024-00663-COA-R3-CV
_____

In 2020, a local board of education adopted changes to its student code of conduct requiring, among other things, that teachers participate in a student discipline policy and engage in social and emotional learning support. The local teachers' association filed suit, arguing that the board of education was required to engage in collaborative conferencing with the teachers' association before adopting the changes because they constituted "working conditions" under the Professional Educators Collaborative Conferencing Act of 2011, Tennessee Code Annotated section 49-5-608(a). The trial court agreed and granted summary judgment in favor of the teachers' association. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Mark Nolan, Clarksville, Tennessee, for the appellant, Clarksville Montgomery County Board of Education.

Richard L. Colbert, Franklin, Tennessee, for the appellee, Clarksville Montgomery County Education Association.

Jennifer White and Ben Torres, Nashville, Tennessee, for the Amicus Curiae, The Tennessee School Boards Association.

**OPINION**

# I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the interpretation and application of the Professional Educators Collaborative Conferencing Act of 2011 ("PECCA"). PECCA provides that teachers, referred to as "professional employees," are entitled to certain rights, including the right to engage in "collaborative conferencing." Tenn. Code Ann. § 49-5-608(a). Collaborative conferencing is

> the process by which the chair of a board of education and the board's professional employees, or such representatives as either party or parties may designate, meet at reasonable times to confer, consult and discuss and to exchange information, opinions and proposals on matters relating to the terms and conditions of professional employee service, using the principles and techniques of interest-based collaborative problem-solving[.]

Tenn. Code Ann. § 49-5-602(2). Local boards of education are required to engage in collaborative conferencing with regard to certain "terms and conditions of employment" of professional employees, as specified by Tennessee Code Annotated section 49-5-608(a). *Id.* (noting that the terms and conditions subject to collaborative conferencing "include and are limited to" those listed).

One area where collaborative conferencing is required is "working conditions," except as "prescribed by federal law, state law, private act, municipal charter or rules and regulations of the state board of education, the department of education or any other department or agency of state or local government[.]" Tenn. Code Ann. § 49-5-608(a)(5). The term "working conditions" is expressly defined by PECCA:

> "Working conditions of professional employees" or "terms and conditions of professional service" means those fundamental matters that affect a professional employee financially or the employee's employment relationship with the board of education and that are specifically designated as such under this part. The term "working conditions" or "terms and conditions of professional service" is intended to be narrowly defined and does not include any matters not specifically designated under this part.

Tenn. Code Ann. § 49-5-602(13). PECCA further provides, however, that

> No other terms or conditions of employment shall be the subject of collaborative conferencing between the board of education and the professional employees or their representatives and no collaborative conferencing shall be conducted on the following subjects: . . .

(5) All personnel decisions concerning assignment of professional employees, including, but not limited to, filling of vacancies, assignments to specific schools, positions, professional duties, transfers within the system, layoffs, reductions in force, and recall. . . . .

Tenn. Code Ann. § 49-5-608(b).

Over the course of the 2019–2020 school year, the teachers represented by Plaintiff/Appellee the Clarksville Montgomery County Education Association ("the Education Association") engaged in collaborative conferencing with Defendant/Appellant the Clarksville Montgomery County Board of Education ("the Board"). The purpose of the collaborative conferencing was to agree to a Memorandum of Understanding ("MOU") to set out the terms and conditions of professional employment under PECCA. "School Discipline" was a topic included for discussion during a March 9, 2020 collaborative conference session. In particular, collaborative conferencing discussed the "Vanderbilt Study," which considered the cost to instruction time when teachers handle disciplinary interruptions.

At the same time that changes were being contemplated to the MOU, the Board was also contemplating changes to the Montgomery County School System Student Code of Conduct ("Student Code of Conduct"), which sets out "standards of conduct and behavior that must be met by all pupils as a condition to the right of such pupils to attend schools in this district." No classroom teachers or representatives of the Education Association were included on the committee that developed the new Student Code of Conduct.

Culminating in May 2020, the Board adopted changes to the 2020–2021 Student Code of Conduct that revised how student discipline was handled and called for teachers to participate in social and emotional learning support. The disciplinary changes focused on the categorization of student offenses, the use of points, an added emphasis on support and interventions, and changes in wording to align with current or best practices. With regard to the categorization of student offenses, the Student Code of Conduct delineated four "Categories." Category 1 offenses were handled by the classroom teacher. Category 2 offenses required "minor" office referrals. Category 3 offenses called for more serious office referrals. Category 4 offenses would likely result in remandment to alternative school.

Based on what it deemed the additional duties and responsibilities placed on teachers under the Student Code of Conduct, the Education Association filed a complaint against the Board on July 17, 2020, in the Montgomery County Chancery Court ("the trial court"). In particular, the complaint asserted that while the 2019–2020 Student Code of Conduct made student discipline primarily the responsibility of the school principal, the new Student Code of Conduct placed significantly more responsibility for student discipline on teachers in the classroom, which in turn limited time for instruction. The Education Association therefore argued that the adoption of these revisions violated PECCA's

requirement that the Board engage in collaborative conferencing before making changes that affected teachers' "working conditions."

The Board answered the complaint on August 26, 2020, denying that it had violated PECCA in adopting the changes to the Student Code of Conduct. Therein, the Board denied that teachers were not responsible for student discipline under prior Student Codes of Conduct or that changes in how student discipline were handled implicated "working conditions" under PECCA.

The Education Association moved for summary judgment on May 2, 2023. The Education Association asserted that the changes shifted the responsibility for handling certain offenses from administrators to teachers, requiring additional training for teachers and causing the loss of effective instructional time. In support, the Education Association cited the depositions of Mary Gist, the Director of Schools, and Dr. Sean Impeartrice, the Chief Academic Officer. Ms. Gist testified that prior to the changes to the Student Code of Conduct, there were variations in how schools handled discipline. Moreover, teachers were given the added responsibility to engage in social and emotional learning support with their students. Dr. Impeartrice agreed during his deposition that when leadership does not effectively handle disciplinary issues, teachers lose instructional time to handling discipline, as well as that losing instructional time adversely affects teaching and learning.

The Board responded by filing its own motion for summary judgment on December 27, 2023. Because the changes to the Student Code of Conduct did not involve the employee's financial matters or employment relationship with the school system, the Board argued that the changes did not constitute "working conditions" to which the collaborative conferencing process was applicable. The Board submitted the affidavit of Jeanine Johnson, Chief Human Resources Office for the school system, and prior agreed MOUs indicating that "working conditions" governed by the yearly MOU included extra duty, length of the school day, employee dress code, employee discipline and process, planning time and teaching assignments, and additional duties.[1] In essence, the Board argued that a "working condition" governs teacher behavior, while a discipline policy governs student behavior. Moreover, the Board argued that section 49-5-608(a)(5) excluded discipline policy from the definition of "working conditions" because Tennessee Code Annotated section 49-6-4002 requires local school boards to adopt discipline policy without requiring collaborative conferencing. *See* Tenn. Code Ann. § 49-5-608(a)(5) (excluding from collaborative conferencing "those working conditions which are prescribed by . . . state law"). Instead, the local board is only required to "seek recommendations" from teachers, parents, and others in the community. Tenn. Code Ann. § 49-6-4002(c).

The trial court heard the competing motions on April 2, 2024. On April 26, 2024,

---

[1] The attached MOUs specifically references a "Building Level Teaching Assignments and Additional Duties Policy."

- 4 -

the trial court entered an order in favor of the Education Association. The trial court specifically ruled that

> insofar as changes to the Student Code of Conduct affect teachers' discipline of students and set[] forth boundaries or levels of discipline or punishment to be dispensed by Teacher, or place[] duties upon teachers to engage in certain process[es] in reacting to student misconduct and carrying out the discipline of students, the same constitute[] 'working conditions' and are subject[] to collaborative conferencing.

Accordingly, the trial court concluded that the Board violated the terms and spirit of PECCA. The trial court, however, declined to "undo the changes to the Student Code of Conduct that have been previously implemented," as the Education Association did not seek "such retrospective relief." The trial court therefore ruled that, going forward, the Board was required to engage in collaborative conferencing with the Education Association "regarding any changes to the Student Code of Conduct insofar as any changes to the Student Code of Conduct regulate teacher discipline of students, as well as any disciplinary action against teachers for their failure to comply with their assigned duties and obligations under the Student Code of Conduct." The Board then appealed to this Court.

## II. ISSUES PRESENTED

The Board presents a single issue in this appeal, which is taken and slightly restated from its brief: Whether the trial court properly interpreted PECCA as requiring collaborative conferencing for changes made to the Student Code of Conduct.

## III. STANDARD OF REVIEW

We review the trial court's grant of summary judgment de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). As part of our review, we must "take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993) (citations omitted), *holding modified by Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), *holding modified by Rye*, 477 S.W.3d 235. We similarly accept the evidence presented by the nonmoving party as true and resolve any doubts about the existence of a genuine issue of material fact in its favor. *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 887 (Tenn. 2019) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008)).

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. In this case, neither party asserts that any facts are disputed. Instead, the primary question is how PECCA should be interpreted and applied in this case. The interpretation of statutes and their application to particular facts are questions of law generally amenable to summary judgment. *Metro. Dev. & Hous. Agency v. Trinity Marine Nashville, Inc.*, 40 S.W.3d 73, 76 (Tenn. Ct. App. 2000). The trial court's conclusions as to the interpretation of a statute are likewise not entitled to a presumption of correctness. *Goodman v. City of Savannah*, 148 S.W.3d 88, 91 (Tenn. Ct. App. 2003).

## IV. ANALYSIS

In this case, it is undisputed that the Board made changes to the 2020–2021 Student Code of Conduct without engaging in collaborative conferencing regarding those changes. There is also no dispute that the Board is required by PECCA to engage in collaborative conferencing over "working conditions" as defined by Tennessee Code Annotated section 49-5-602(13). The primary question in this case, then, is whether the changes to the Student Code of Conduct constitute changes to "working conditions" as defined by PECCA.[2]

In addressing this question, we keep the following in mind:

> The cardinal canon of statutory construction requires the courts to ascertain and to carry out the General Assembly's intent. A statute's intent is reflected in the statute's words, and, therefore, we must focus initially on the words of the statute. When the words of the statute are clear and unambiguous, we need not look beyond the statute, but rather, we must simply enforce the statute as it is written.

*Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 213 (Tenn. 2009) (citations omitted). Moreover, we must consider the whole text of the statute and the overall statutory framework, ensuring that we "interpret each word 'so that no part will be inoperative, superfluous, void or insignificant.'" *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022) (quoting *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010)). In other words, "[i]n interpreting statutes, . . . we are required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose." *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 897 (Tenn. 2021) (quoting *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 897 (Tenn. 2011)).

---

[2] The Board raises a secondary argument concerning Tennessee Code Annotated section 49-6-4002. Based on our interpretation of Tennessee Code Annotated section 49-5-608(a), we need not reach that argument. It is therefore pretermitted.

In this case, the parties agree that in order to determine what "working conditions" are required to be the subject of collaborative conferencing, we look to the express definition provided by Tennessee Code Annotated section 49-5-602(13). Thus, for purposes of this appeal, "working conditions" are defined as "those fundamental matters that affect a professional employee financially or the employee's employment relationship with the board of education and that are specifically designated as such under this part." Tenn. Code Ann. § 49-5-602(13).

The Education Association argues on appeal that the trial court came to the correct conclusion, in ruling that that the changes to the Student Code of Conduct were subject to collaborative conferencing, relying in part on the historical background surrounding PECCA and this area of law. We therefore find it helpful to recap the relevant caselaw and statutory enactments in this area. First, in ***Blount County Education Association v. Blount County Board of Education***, the question involved whether contract terms concerning voluntary and involuntary transfer protection, layoff and recall provisions, non-discrimination, and the duration of the collective bargaining agreement were "working conditions" subject to mandatory bargaining under the predecessor to PECCA, the Education Professional Negotiations Act ("EPNA"). 78 S.W.3d 307, 311 (Tenn. Ct. App. 2002). In its analysis, this Court rejected the argument that "the bargaining history between the parties and whether the parties negotiated in the past over a particular subject impacts whether that particular subject" was the focus of mandatory bargaining. *Id.* at 319. Instead, we concluded that the legislature had "specifically decided and identified which subjects are mandatory[,]" and we were bound by that decision. *Id.*

Consequently, we relied on the language of the statute, and in particular, the dictionary definition of "working conditions"—"descriptive of a proper condition for work or a state of being fit for work"—to hold that voluntary and involuntary transfers, layoff, and recall did not involve "working conditions" as required to be the subject of mandatory bargaining. *Id.* at 318 (quoting *Webster's New Collegiate Dictionary* (2d ed.)). Rather, only non-discrimination and the duration of the memorandum of agreement were considered "working conditions" subject to mandatory bargaining by the Court of Appeals. *Id.*

The question of how to define the term "working conditions" was again raised in ***Polk County Board of Education v. Polk County Education Association***, 139 S.W.3d 304 (Tenn. Ct. App. 2004). In that case, the dispute involved whether a teacher dress code constituted a working condition under EPNA. *Id.* at 305. The trial court concluded that it was not subject to mandatory bargaining and the defendant education association appealed. *Id.* at 305–06. While the appeal was pending, however, the Tennessee General Assembly amended EPNA to include an express definition of "working conditions" as "those fundamental matters that affect a professional employee financially or the employee's employment relationship with the board of education." *Id.* at 306 (quoting ***Polk Cnty. Bd. of Educ. v. Polk Cnty. Educ. Ass'n***, No. E2001-02390-COA-R3-CV, 2002 WL 1357062, at *7 (Tenn. Ct. App. June 21, 2002) (citing 2002 Tenn. Pub. Acts 683, effective May 1,

2002)). As a result, this Court remanded the matter to the trial court to reconsider the dispute in light of the new definition. *Id.* (citing ***Polk Cnty. Bd. of Educ.***, 2002 WL 1357062, at *7). The trial court once again held that the dress code was not a "working condition" subject to mandatory bargaining, and the education association again appealed. *Id.*

In resolving this dispute, we first noted that there are several schools of thought as to how to separate working conditions, which were subject to mandatory bargaining, from educational policy, which were not. *Id.* at 307. One such test requires mandatory bargaining where an issue "bears a rational relationship to the employee's duties—but where the managerial policy concerns substantially outweigh any impact the issue will have on employees, the issue is not bargainable." *Id.* (citing ***Delaware Cnty. Lodge No. 27 v. Penn. Lab. Rels. Bd.***, 722 A.2d 1118 (Pa. Commw. Ct. 1998)). A similar test mandates bargaining over issues "which 'primarily' or 'fundamentally' relate[] to wages, hours and conditions of employment"—that is, "the policy's direct effect on employment conditions should outweigh the policy's effect in furthering the public policy considerations for the issue to be a subject of mandatory bargaining." *Id.* (first quoting ***City of Brookfield v. Wisc. Emp. Rels. Comm.***, 87 Wis. 2d 819, 275 N.W.2d 723 (1979); and then citing ***Sch. Dist. of Drummond v. Wisc. Emp. Rels. Comm.***, 120 Wis. 2d 1, 352 N.W.2d 662 (App. 1984)). Another test requires bargaining if (1) "the subject intimately and directly affects the work and welfare of public employees"; (2) "the issue has not been preempted by statute or regulation"; and (3) "the negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy." *Id.* (citing ***Webster Educ. Ass'n. v. Webster Sch. Dist. # 18-4***, 631 N.W.2d 202 (S.D. 2001)).

We did not expressly apply any of the above tests but instead noted that the common theme is that the school board "must be left with managerial prerogatives in determining policy issues and those issues which impact on the efficient operation of the school system" as balanced against "the employee's right to negotiate on the terms and conditions of employment." *Id.* at 307–08 (citations omitted). Moreover, these questions must be resolved on a case-by-case basis. *Id.* at 308.

Applying this framework to the dispute at hand, we concluded that the dress code fell within the definition of "working conditions" such that it was subject to mandatory bargaining. While the dress code was "not so restrictive or egregious as to require teachers to purchase new wardrobes," the changes could "very well fundamentally impact on the teacher's employment relationship." *Id.* Thus, while the decision to implement the dress code could be considered educational policy, "its enforcement may still be a working condition which must be bargained." *Id.* (citations omitted).

In 2011, EPNA was repealed and replaced with PECCA, which replaced mandatory bargaining with mandatory collaborative conferencing. *See generally* Tenn. Code Ann. §

49-5-606(a); *see also* 2011 Tenn. Laws Pub. Ch. 378 (S.B. 113), effective June 1, 2011. As previously discussed, "working conditions" are now the subject of collaborative conferencing under PECCA. Tenn. Code Ann. § 49-5-608(a)(5). Although the Tennessee General Assembly largely retained the 2002 definition of "working conditions," it included additional language providing that the term "is intended to be narrowly defined and does not include any matters not specifically designated under this part." Tenn. Code Ann. § 49-5-602(13). And the General Assembly has included the caveat that collaborative conferencing does not apply to "personnel decisions concerning assignment of professional employees, including, but not limited to, . . . professional duties[.]" Tenn. Code Ann. § 49-5-608(b)(5).[3]

Turning to the application of PECCA to this case, the trial court concluded that the changes to the Student Code of Conduct constituted "working conditions" under the above definition because "student discipline and control of student behavior and conduct is a core secondary duty of all teachers." The trial court noted that a teacher could be disciplined or even terminated for not complying with the discipline framework contained in the Student Code of Conduct, and stated that it would consider a "pragmatic application" of the relevant statutes, including consideration of a hypothetical scenario involving corporal punishment.[4] Finally, the trial court noted that the Tennessee General Assembly could have specifically excluded student discipline from the definition of "working conditions" but did not do so. So the trial court ruled that the changes to the Student Code of Conduct that imposed additional duties on teachers to take part in student discipline and social and emotional learning involved "working conditions" subject to collaborative conferencing.

For the Education Association's part, it first contends that "working conditions" as used in PECCA "remain[s] synonymous" with the definition at issue in *Polk County Board of Education.* The Education Association further argues that the changes at issue here are even more encompassed by the term "working conditions" than the dress code at issue in *Polk County Board of Education*. Specifically, the changes assign to teachers certain duties in handling student discipline and social and emotional learning. And unlike in *Polk County Board of Education*, the Board admitted that a teacher's failure to comply with the duties assigned under the Student Code of Conduct could result in discipline to the teacher, i.e., failure to comply with the changes could have an adverse effect on the teacher's employment relationship. Moreover, requiring teachers to take part in the discipline process could result in the loss of instructional time, possibly leading to poor

---

[3] It is of note that in addition to the carve-out for "professional duties," this subsection exempts from collaborative conferencing many of those topics that this Court in *Blount County Board of Education* held did not constitute "working conditions" under EPNA. *See* 78 S.W.3d at 318.

[4] Specifically, the trial court questioned a policy change that would require teachers to participate in physical discipline of students. There is no dispute that neither prior policy nor the updated Student Code of Conduct require teachers to be involved in corporal punishment. Still, the trial court ruled that such a change was "very possible" in light of "the evolution of changes in teacher-student discipline[,]" and therefore "particularly applicable and instructive" to the current dispute.

results on standardized tests. This could, in turn, affect a teacher's evaluation results, a factor in "employment decisions," such as termination or tenure. Tenn. Code Ann. § 49-1-302(d)(2)(A). So then, the Education Association contends that these changes "affect . . . the employee's employment relationship with the board of education" and therefore constitute "working conditions" for purposes of collaborative conferencing.

Respectfully, we cannot agree with either the trial court's or the Education Association's reasoning. For one, while Tennessee's rules of statutory construction do not require ignorance of practical realities, our foremost consideration in determining the meaning of a statute is the words employed by the legislature, followed closely by the broader statutory context. *Cf. Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 213; *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 845–46 (Tenn. 2019). To this end, we disagree with the Education Association that the definition of "working conditions" contained in PECCA is "synonymous" with the definition at issue in *Polk County Board of Education*. While the base definition may be the same, the definition contained in PECCA must be construed "narrowly" and "does not include any matters not specifically designated under this part." Tenn. Code Ann. § 49-5-602(13). Any conclusion we reach in this case must keep in mind this important distinction.

Second, in determining whether a specific topic falls within the definition of "working conditions" we consider each case individually on a case-by-case basis keeping in mind "the specific policy at issue[.]" *Polk Cnty. Bd. of Educ.*, 139 S.W.3d at 308. While one of the specific policies at issue does involve student discipline, it does not involve any requirement that teachers participate in corporal punishment. Speculating as to the effect of such a hypothetical policy is therefore not helpful to resolving the dispute at hand. *Cf. State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000) (holding that courts should not decide a case where "the controversy depends upon a future or contingent event, or involves a theoretical or hypothetical state of facts").

We also cannot agree that the Tennessee General Assembly's choice not to expressly **exclude** student discipline is illustrative of their intention to **include** that topic among those subject to collaborative conferencing. In fact, we conclude that the opposite is true. Importantly, under EPNA, eight "conditions of employment" were subject to mandatory bargaining:

(1) Salaries or wages;
(2) Grievance procedures;
(3) Insurance;
(4) Fringe benefits, but not to include pensions or retirement programs of the Tennessee consolidated retirement system;
(5) Working conditions;
(6) Leave;
(7) **Student discipline procedures**; and

(8) Payroll deductions.

Tenn Code Ann. § 49-5-611(a) (2002) (emphasis added). The Tennessee General Assembly adopted a nearly identical list of topics subject to collaborative conferencing in PECCA, with one notable exception: the exclusion of student discipline procedures. Specifically, PECCA's list of topics subject to collaborative bargaining is limited to the following:

(1) Salaries or wages;
(2) Grievance procedures;
(3) Insurance;
(4) Fringe benefits, but not to include pensions or retirement programs of the Tennessee consolidated retirement system or locally authorized early retirement incentives;
(5) Working conditions; except those working conditions which are prescribed by federal law, state law, private act, municipal charter or rules and regulations of the state board of education, the department of education or any other department or agency of state or local government;
(6) Leave; and
(7) Payroll deductions; except as provided in subsection (b).

Tenn. Code Ann. § 49-5-608(a).

In determining the meaning of a statute, we may, depending on the circumstances, consider a statute's "evolution over the course of time[.]" ***Coffee Cnty. Bd. of Educ.***, 574 S.W.3d at 846 (citing ***Powers v. State***, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)). "When the legislature makes a change in the language of a statute, we must assume that it was deliberate." ***State v. Turner***, 193 S.W.3d 522, 527 (Tenn. 2006) (citation omitted). Consequently, "a change in the language of a prior statute presumably connotes a change in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: Interpretation of Legal Texts* 256 (2012) (detailing the "reenactment canon" of statutory construction); *see also* ***Deberry***, 651 S.W.3d 918, 925 (Tenn. 2022) (stating that we determine a statute's meaning through consideration "of the statutory text, the broader statutory framework, *and any relevant canons of statutory construction*" (emphasis added)). One example of this canon in action is where "a statute providing for an award to the prevailing party of 'attorney's fees and expert-witness fees' has been amended to award only 'attorney's fees,' there would be no basis for the argument (sometimes made) that attorney's fees includes reimbursement of the attorney's expenditures for expert witnesses." Scalia & Garner, *supra*, at 256.

The same is essentially true here. Under EPNA, both "working conditions" and student discipline were listed as separate topics subject to mandatory bargaining. When PECCA was enacted, however, the Tennessee General Assembly omitted student

discipline from the topics that were subject to collaborative conferencing, while keeping the other seven topics previously listed. We presume that this change was deliberate, and that a change in meaning was intended by our legislature. *Turner*, 193 S.W.3d at 527. Thus, there appears to be "no basis for the argument" that this legislative silence should be construed as evincing an intent that student discipline fall within the definition of "working conditions" under PECCA. Scalia & Garner, *supra*, at 256. Rather, it appears patent that the Tennessee General Assembly intended to exclude student discipline from collaborative conferencing through its deliberate omission. The most reasonable conclusion is therefore that in enacting PECCA, the Tennessee General Assembly intended that student discipline be considered neither a "working condition" nor a topic subject to collaborative conferencing.

Consideration of *Polk County Board of Education* and other portions of PECCA lend support to our conclusion. Importantly, our legislature has specifically mandated that the term "working conditions" "does not include any matters not specifically designated under this part." Tenn. Code Ann. § 49-5-602(13). And neither student discipline nor social and emotional learning support are specifically designated as topics for collaborative conferencing in PECCA.

Of course, the Education Association maintains that student discipline and the directive to participate in social and emotional learning need not be specifically designated so long as it affects the employment relationship with the Board. Still, in determining how this language should be interpreted, we must be mindful of the legislature's mandate that the term be "narrowly defined." *See id.* Keeping that in mind, we must conclude that the changes to the Student Code of Conduct at issue here are more closely connected with managerial and educational policy than a dress code affecting only teachers,[5] such that they would not fall within the definition of "working conditions."[6] *See Polk Cnty. Bd. of Educ.*, 139 S.W.3d at 307; *see also Penn. Lab. Rels. Bd. v. State Coll. Area Sch. Dist.*, 461 Pa. 494, 507, 337 A.2d 262, 268 (Penn. 1975) (holding that even if a matter "does affect wages, hours and terms and conditions of employment," if "the matter is one of inherent managerial policy," it is not subject to mandatory bargaining as a "working condition[]").

Indeed, the changes at issue have no "direct effect" on employment but only the potential to affect employment based on possible contingencies. *Id.* (citing *Sch. Dist. of Drummond*, 352 N.W.2d at 662). But of course, even a tenured teacher can be disciplined

---

[5] Under EPNA, "education policy" was specifically excluded from mandatory bargaining and was defined "to include such things as the content of the curriculum, teaching strategies, class offerings, student placement and other things related to the policy's effect on the school system's overall ability to meet and maintain the state's student performance standards." Tenn. Code Ann. § 49-5-601(b)(4) (2002). No such definition is contained in PECCA.

[6] In particular, the parties have provided little proof of what is actually encompassed by the policy requiring teachers to engage in "social and emotional learning support" such that we could conclude that this was anything other than a basic managerial and/or educational policy.

for failing to perform their duties up to the Board's standards. *See* Tenn. Code Ann. § 49-5-511 (providing that a tenured teacher may be dismissed or suspended for, inter alia, inefficiency); Tenn. Code Ann. § 49-5-501 (defining inefficiency as "being below the standards of efficiency maintained by others currently employed by the board for similar work, or habitually tardy, inaccurate or wanting in effective performance of duties"). To hold that any policy that could potentially affect a teacher's employment—no matter how closely aligned with the Board's managerial or educational policy or attenuated from the teacher's employment conditions—is a "working condition" would be to expand the definition of that term beyond the legislature's narrow intention.

Moreover, a teacher's "professional duties" are simply not subject to collaborative conferencing.[7] *See* Tenn. Code Ann. § 49-5-608(b) (stating that "no collaborative conferencing shall be conducted on the following subjects: . . . . [a]ll personnel decisions concerning assignment of professional employees, including, but not limited to, . . . professional duties").[8] Here, requiring teachers to participate as the first line in a student discipline policy or support social and emotional learning appears to be closely aligned with a teacher's professional duties, at least more than compliance with a teacher dress code. Thus, both the trial court's and the Education Association's focus on the additional duties imposed by the changes to the Student Code of Conduct—and the potential consequences for failing to perform those duties—as evidence that they should be subject to collaborative conferencing is, respectfully, misplaced.[9]

In sum, particularly in light of the Tennessee General Assembly's decision to omit student discipline from Tennessee Code Annotated section 49-5-608(a), as well as our duty to interpret the term "working conditions" narrowly and without expanding it to include matters not specifically designated and all of the foregoing, we conclude that trial court erred in ruling that the changes to the Student Code of Conduct were subject to collaborative conferencing under PECCA. The trial court's decision to grant summary judgment to the Education Association is therefore reversed, and summary judgment is instead granted in favor of the Board.

---

[7] The term "professional duties" is not defined by PECCA.

[8] None of the parties devote much argument to this subsection, despite both the trial court and the Education Association relying heavily on the fact that teachers have additional duties under the changes to the Student Code of Conduct. This subsection was specifically raised, however, in the Board's answer. Moreover, this Court has a duty to apply the controlling law, regardless of whether it is cited by the parties. *See* ***Kocher v. Bearden***, 546 S.W.3d 78, 85 n.8 (Tenn. Ct. App. 2017) (quoting ***Coffee v. Peterbilt of Nashville, Inc.***, 795 S.W.2d 656, 658 n.1 (Tenn. 1990)).

[9] It is true that previous MOUs between the Education Association and the Board have included the topic "Extra Duty," as well as a policy governing building level teaching assignments and additional duties. However, the record does not elaborate as to what specifically is covered by those topics. Moreover, this Court has previously held that the fact that the parties previously agreed to bargain over a topic does not, ipso facto, lead to the conclusion that it is a topic subject to mandatory bargaining under the "working conditions" definition. ***Blount Cnty. Educ. Ass'n***, 78 S.W.3d at 319.

## IV. CONCLUSION

The judgment of the Montgomery County Chancery Court is reversed, and this matter is remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellee the Clarksville Montgomery County Education Association, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE